UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | Civil Action No. 1:05-2343 (RMC) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S MEMORANDUM OF** |
| v. | ) | **LAW IN SUPPORT OF DEFENDANT'S** |
| | ) | **MOTION TO DISMISS** |
| DEPARTMENT OF STATE, | ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBIT 2:**

**PLAINTIFF'S FOIA REQUEST
DATED OCTOBER 8, 2003**



*Because no one is above the law!*

**VIA FACSIMILE (202)-456-6337; (202)-514-1009; (703)-613-3007; (202)-261-8579; (202)-439-5032; (202)-324-3367; (202)-366-9170; AND CERTIFIED MAIL 7002 0510 0001 8971 0591; 7002 0510 0001 0560; 7002 0510 0001 8971 0553; 7002 0510 0001 8971 0546; 7002 0510 0001 8971 0539; 7002 0510 0001 8971 0522; 7002 0510 0002 1070 4773.**

October 8, 2003

Departmental Disclosure Officer
DEPARTMENT OF HOMELAND
  SECURITY
Washington, DC 20528

Robert T. Herman
CENTRAL INTELLIGENCE AGENCY
FOIA and Privacy Coordinator
Washington, DC 20505

Margaret P. Garfeld
US DEPARTMENT OF STATE
Director, Office of IRM Programs
  and Services, SA-2
5th Floor
Washington, DC 20522-6001

Melanie Ann Pustay
Office of Information and Privacy
US DEPARTMENT OF JUSTICE
Suite 570, Flag Building
Washington, DC 20530-0001

Tracy Paquin
Acting FOIA Director, ARC-40
FEDERAL AVIATION ADMINISTRATION
800 Independence Ave. SW
Washington, DC 20591

David M. Hardy, Chief
Records/Information Dissemination Section
Records Management Division
FEDERAL BUREAU OF INVESTIGATION
935 Pennsylvania Ave. NW
Washington, DC 20535-0001

Robert I. Ross, Attorney-Advisor
Office of the General Counsel (C-10/10102)
DEPARTMENT OF TRANSPORTATION
400 7th Street, SW
Washington, DC 20590

Re: **Freedom of Information Act Request**

Dear Sir/Madam:

GRAFELD DECLARATION
Civil Action No. 1:05cv02343
Exhibit 2

Judicial Watch Privacy/FOIA Requests
October 7, 2003
Page 2

Judicial Watch, Inc., pursuant to the Freedom of Information Act (5 U.S.C. § 552), requests that the US Department of State, Federal Bureau of Investigation (FBI), Federal Aviation Administration (FAA), Department of Homeland Security (DHS), US Department of Justice, Department of Transportation (DOT), and the Central Intelligence Agency (CIA) produce all correspondence, memoranda, documents, reports, records, statements, audits, lists of names, applications, diskettes, letters, expense logs and receipts, calendar or diary logs, facsimile logs, telephone records, call sheets, tape recordings, video/movie recordings, notes, examinations, opinions, folders, files, books, manuals, pamphlets, forms, drawings, charts, photographs, electronic mail, and other documents and things that refer of relate to the following in any way, within twenty (20) business days:

1) The decision to allow subjects of the Kingdom of Saudi Arabia, including but not limited to members of the House of Saud and/or members of the Bin Laden family, to leave the United States within 10 days of the terrorist attacks of September 11, 2002.[1]

2) Flights containing subjects of the Kingdom of Saudi Arabia, including but not limited to members of the House of Saud and/or members of the Bin Laden family, allowed to leave the United States between September 11, 2001 and September 15, 2003.[2]

3) A September 13, 2001 flight between Raytheon Airport Services, Tampa International Airport, and Blue Grass Airport in Lexington Kentucky.[3]

4) The decision to allow subjects of the Kingdom of Saudi Arabia, including but not limited to members of the House of Saud and/or members of the Bin Laden family, to leave the United States by airplane after

---

[1] Craig Unger. "Saving the Saudis," *Vanity Fair*. October 2003. p. 162-167; Kathy Steele. "Phantom Flight from Florida," *The Tampa Tribune*. October 5, 2001. p 1. (attached)

[2] *Ibid*

[3] Kathy Steel. *Op Cit.*

Judicial Watch Privacy/FOIA Requests
October 7, 2003
Page 3

      September 11, 2001without being interviewed by the
      FBI. [4]

      5) All communication between the CIA, and/or
      FBI, and/or FAA and/or the State Department
      and the Executive Office of the President (EOP)
      and/or the Office of the Vice President and/or any
      agent or representative of President George W. Bush
      concerning the decision to allow subjects of the Kingdom
      of Saudi Arabia, including but not limited to members
      of the House of Saud and/or members of the Bin Laden
      family, to leave the United States by airplane after
      September 11, 2001.

      6) A list of all subjects of Kingdom of
      Saudi Arabia, including but not limited to members
      of the House of Saud and/or members of the Bin Laden
      family, permitted to leave the United States
      between September 11 2001 and October 1, 2001.

If any responsive record or portion thereof is claimed to be exempt from production under the Freedom of Information Act ("FOIA"); the FCC must provide sufficient identifying information (with respect to each allegedly exempt record or portion thereof) to allow Judicial Watch, Inc. to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir 1973), *cert. denied*, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided to Judicial Watch, Inc. after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

      **Judicial Watch, Inc. hereby requests a waiver of both search and duplication fees.**

Judicial Watch, Inc. is entitled to a waiver of search and duplication fees because the records it seeks are not sought for a commercial use and Judicial Watch, Inc. is a member of the news media. 5 U.S.C. § 552(a) (4)(A)(ii)(II). As a 501 (c)(3) not-for-profit organization, Judicial Watch, Inc. has no commercial purpose. It is a non-profit, tax-exempt educational foundation organized to increase public understanding of government operations and activities, as well as the importance of ethics and the rule of law in government. Judicial Watch, Inc.

---

[4] Craig Unger. *Op Cit.*

**Judicial Watch Privacy/FOIA Requests**
October 7, 2003
Page 4

regularly requests information about the operations of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and regularly publishes and disseminates its work to the public in furtherance of its educational mission.

Judicial Watch, Inc. uses the following means, among others, to disseminate its works to the public:

(1)    Judicial Watch, Inc. produces several live radio programs, including a two-hour program entitled "The Judicial Watch Report," which airs nationally once every week on approximately 43 radio stations. Judicial Watch, Inc. has produced an hour long Spanish language program that airs twice weekly on WQBA -- 1140 AM in Miami, Florida. Since October 29, 2001, Judicial Watch, Inc. also has produced a two-hour program that airs daily on the USA Radio Network. Judicial Watch, Inc.'s weekly and the daily radio programs also can be heard via the Internet at www.USARadio.com and www.JudicialWatch.org.

(2)    Judicial Watch, Inc. also maintains an Internet site, www.JudicialWatch.org, on which the public can view and inspect records obtained through FOIA, records obtained through civil litigation, press releases, editorial works, deposition transcripts and court opinions, among other materials. This website is viewed by over 1,700 people per day on average, and on several occasions, has logged up to 600,000 visitors in a single day.

(3)    Judicial Watch, Inc. also publishes a monthly newsletter, which is sent to approximately 210,000 individuals. FOIA documents are presented, analyzed and explained in each issue. It also utilizes an E-mail Infonet service which sends out updates of Judicial Watch's activities over the Internet on nearly a daily basis to 13,700 persons.

(5)    Judicial Watch, Inc. also produces several editorial works each week in the form of press releases, which are "blast faxed" to hundreds of radio and television stations, as well as newspapers throughout the country

(6)    Judicial Watch, Inc. also publishes periodic reports. For example, on September 28, 1998, Judicial Watch, Inc. published its <u>Interim Report</u>

Judicial Watch Privacy/FOIA Requests
October 7, 2003
Page 5

>  on Crimes and Other Offenses Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office. This 145-page report was accompanied by nearly 4,000 pages of supporting documentation, and was crafted, in part, from the raw materials obtained by Judicial Watch, Inc. through FOIA requests. This distinct work has been disseminated widely to the public. On or about August 10, 1999, Judicial Watch, Inc. published its Filegate Status Report, which is 136 pages long and is supported by nearly 1000 pages of documentation. Another recent report by Judicial Watch, Inc. is The Judicial Watch Florida Recount, an independent, non-partisan analysis of the results of Florida's hotly contested 2000 Presidential election based upon an sampling of ballots reviewed by Judicial Watch, Inc. pursuant to Florida's version of FOIA. This document was published on March 22, 2001. In addition, Judicial Watch, Inc. published The Judicial Watch 2002 "State of the Union" Report, Bush Administration Ethics Enforcement: "A Failure of Leadership," in February 1, 2002, and it's most recent publication is Fatal Neglect: The US Governments Continuing Failure to Protect American Citizens from Terrorists, published September 11, 2002.

Judicial Watch also uses records it obtains pursuant to FOIA at public events such as conferences, seminars and speeches. For example, in October of 2001, Judicial Watch held its third annual "Ethics in Government Conference" in Miami, Florida. Previous conferences were held in Pasadena, California (1999), and Washington, DC (2000). Judicial Watch also works with other media organizations to publish new stories that are in the public interest. The Chairman and President of Judicial Watch, Inc. also frequently appear on nationally broadcast television and radio programs. Judicial Watch is a member of the National Religious Broadcast Association and has been granted press credentials at a number of national conventions and other events.

Judicial Watch, Inc. therefore qualifies as a member of the media and is entitled to a waiver of search fees. *See National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381 (D.C. Cir. 1989). In fact, Judicial Watch, Inc. has been recognized previously as a member of the media in other FOIA litigation. *See Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000).

**Judicial Watch Privacy/FOIA Requests**
**October 7, 2003**
**Page 6**

Judicial Watch, Inc. also is entitled to a waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Again, because Judicial Watch, Inc. has no commercial purpose, its request is not "in the commercial interest of the requestor."

Judicial Watch, Inc.'s request is likely to contribute significantly to the public's understanding of government operations and activities. Typically, agencies look to the following four points in making this determination: (1) whether the subject of the request concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding.

Without question, the subject of this request will contribute significantly to the public understanding of the operations and activities of government, namely the phantom flights out of the United States shortly after September 11, 2001, which reportedly contained citizens of the Kingdom of Saudi Arabia, including members of the Saudi Royal Family and the family of Osama Bin Laden. Although it was determined that the 9/11 hijackers were Saudi subjects in the US on visas, these subjects, however, were allowed to return to Saudi Arabia without being interviewed by the FBI. These flights have caused controversy considering the close relationship Presidents George H. W. Bush and son George W. Bush have with the Saudi Royal Family, beginning in the 1970 with Bush-family petroleum ventures.[5] The media has questioned whether these flights allowing individuals to leave was facilitated by diplomatic and/or personal interests the Bush administration has with the Saudi Royal Family. Law enforcement officials have questioned the flights, which allowed possible leads (including blood relatives of Bin Laden) to escape the country without questioning. The American public deserves the right of disclosure to the administration's decision to allow select individuals to leave the country after the worst terrorist attack in American history, at a time when all other flights for American citizens (private and international) were grounded, and which could have forfeited further leads and apprehension of suspects in the investigation of the 9/11 attack on America.

Second, disclosure of the requested records will contribute to an understanding of this particular decision, as they relate directly to the decision to allow these Saudi citizens to leave the United States without interrogation.

---

[5] Ibid.

Judicial Watch Privacy/FOIA Requests
October 7, 2003
Page 7

    Third, disclosure of the requested records will contribute to the understanding of "a reasonably broad audience of persons interested in the subject." Specifically, Judicial Watch, Inc. has a demonstrable "ability and intention" to convey the information to the public, as evidenced by the description of its various media outlets outlined above. A "reasonably broad" audience obviously is interested in the subject-matter of this request, as demonstrated by the volumes of articles and reports that already appeared in *Vanity Fair*, *The Tampa Tribune*, *The New York Times*, *Newsweek*, *The Guardian*, *The Wall Street Journal*, BBC News, CBS News, ABC News, Reuters, the *Los Angles Times* and others. Judicial Watch, Inc. will disseminate the information it obtains in response to this FOIA request via its other media outlets.

    Fourth, and finally, disclosure of the requested records will enhance public understanding of this noteworthy decision to a significant extent because little is currently known about why the administration sought to have these individuals leave the country, law-enforcement concerns non-withstanding. According to *Vanity Fair*, "Officially, the White House declined to comment, and a source inside asserted that the flights never took place. However, former high-level Bush-administration officials have told *Vanity Fair* otherwise."[6] The records requested by Judicial Watch, Inc. undoubtedly will shed additional light on this decision.

    Given these compelling circumstances, Judicial Watch, Inc. is entitled to a public interest fee waiver of both search costs and duplication costs. 5 C.F.R. § 16.11(k)(2)(i) - (iv). We look forward to receiving the requested documents and a full public interest fee waiver within twenty (20) business days.

Sincerely,

JUDICIAL WATCH, INC.

*[signature]*

Christopher J. Farrell

CJF/mac

---

[6] Ibid

THE WAR AT HOME



FAMILY FRIENDS: President Bush and Saudi ambassador Prince Bandar bin Sultan at Bush's ranch in Crawford, Texas, August 27, 2002. *Inset:* the burning towers on 9/11.

# SAVING THE SAUDIS

Just days after 9/11, wealthy Saudi Arabians, including members of the bin Laden family, were whisked out of the U.S. on private jets. No one will admit to clearing the flights, and the passengers weren't questioned. Did the Bush family's long relationship with the Saudis help make it happen?

### BY CRAIG UNGER

On the morning of September 13, 2001, a 49-year-old private eye named Dan Grossi got an unexpected call from the Tampa Police Department. Grossi had worked with the Tampa force for 20 years before retiring, and it was not particularly unusual for the police to recommend former officers for special security jobs. But Grossi's new assignment was very much out of the ordinary.

Two days earlier, terrorists had hijacked four airliners and carried out the worst atrocity in American history. Fifteen of the 19 hijackers had been from Saudi Arabia. "The police had been giving Saudi students protection since September 11," Grossi recalls. "They asked if I was interested in escorting these students from Tampa to Lexington, Kentucky."

Grossi was told to go to the airport, where a small charter jet would be available to take him and the Saudis on their flight. He was dubious about the prospects of accomplishing his task. "Quite frankly, I knew that everything was grounded," he says. "I never thought this was going to happen." Even so, Grossi, who'd been asked to bring a colleague, phoned Mañuel Perez, a former F.B.I. agent, to put him on alert. Perez was equally unconvinced. "I said, 'Forget about it,'" Perez recalls. "'Nobody is flying today.'"

The two men had good reason to be skeptical. Within minutes of the attacks on 9/11, the Federal Aviation Administration had sent out a special notification called a NOTAM—a notice to airmen—ordering every airborne plane in the United States to land at the nearest airport as soon as possible, and prohibiting planes on the ground from taking off. For the next two days, commercial and private aviation throughout the entire United States ceased. Former vice president Al Gore was stranded in Austria when his flight to the U.S. was canceled. Bill Clinton postponed travel as well. Major-league baseball games were called off. For the first time in a century, American skies were nearly as empty as they had been when

LARGE PHOTOGRAPH BY ERIC DRAPER; INSET BY TRICIA MEADOWS

the Wright brothers first flew at Kitty Hawk.

Nevertheless, at 1:30 or 2 P.M. on the 13th, Dan Grossi received his phone call. He was told the Saudis would be delivered to Raytheon Airport Services, a private hangar at Tampa International Airport.

When he and Perez met at the terminal, a woman laughed at Grossi for even thinking he would be flying that day. Commercial flights had slowly begun to resume, but at 10:57 A.M. the F.A.A. had issued another notice to airmen, a reminder that private aviation was still prohibited. Three private planes violated the ban that day, and in each case a pair of jet fighters quickly forced the aircraft down. As far as private planes were concerned, America was still grounded. "I was told it would take White House approval," says Grossi.

Then one of the pilots arrived. "Here's your plane," he told Grossi. "Whenever you're ready to go."

Unbeknownst to Dan Grossi, Prince Bandar bin Sultan, the 52-year-old Saudi Arabian ambassador to the United States, had been in Washington orchestrating the exodus of about 140 Saudis scattered throughout the country who were members of, or close to, two enormous families. One was the House of Saud, the family that rules the Royal Kingdom of Saudi Arabia and that, owing to its vast oil reserves, is the richest family in the world. The other was the ruling family's friends and allies the bin Ladens, who, in addition to owning a multi-billion-dollar construction conglomerate, had spawned the notorious terrorist Osama bin Laden. Thanks to the bin Ladens' extremely close relationship with the House of Saud, the family's huge construction company, the Saudi Binladin Group, had won contracts to restore the holy mosques in Mecca and Medina, two of the greatest icons in all of Islam.

The repatriation of the Saudis is far more than just a case of wealthy Arabs being granted special status by the White House under extraordinary conditions. For one thing, in the two years since September 11, a number of highly placed Saudis, including both bin Ladens and members of the royal family, have come under fire for their alleged roles in financing terrorism. Four thousand relatives of the victims of 9/11 have filed a $1 trillion civil suit in Washington, D.C., charging the House of Saud, the bin Ladens, and hundreds of others with wrongful death, conspiracy, and racketeering for having contributed tens of millions of dollars to charities that were al-Qaeda fronts. Newsweek has reported that Prince Bandar's wife, perhaps unwittingly, sent thousands of dollars to charities that ended up funding the hijackers. In addition, F.B.I. documents marked "Secret" indicate that two members of the bin Laden family, which has repeatedly distanced itself from Osama bin Laden, were under investigation by the bureau for suspected associations with an Islamic charity designated as a terrorist support group.

Most recently, in July, the administration asked Congress to withhold 28 pages of its official report on 9/11. According to news reports, the classified section charges that there were ties between the hijackers and two Saudis, Omar al-Bayoumi and Osama Bassnan, who had financial relationships with members of the Saudi government. Saudi officials deny that their government was in any way linked to the attacks. The Saudis have asked that the pages be declassified so they can refute them, but President Bush has refused.

Terrorism experts say that the Saudis who were in the U.S. immediately after the attacks might have been able to shed light on the structure of al-Qaeda and to provide valuable leads for investigating 9/11. And yet, according to sources who participated in the repatriation, they left the U.S. without even being interviewed by the F.B.I.

Officially, the White House declined to comment, and a source inside asserted that the flights never took place. However, former high-level Bush-administration officials have told Vanity Fair otherwise.

How was it possible that, just as President Bush declared a no-holds-barred global war on terror that would send hundreds of thousands of U.S. troops to Afghanistan and Iraq, and just as Osama bin Laden became Public Enemy No. 1 and the target of a worldwide manhunt, the White House would expedite the departure of so many potential witnesses, including two dozen relatives of the man behind the attack itself?

The incident is particularly important in light of the special relationship the Saudis have long had with the United States—and the Bush family in particular. For decades, Saudi Arabia has been one of America's two most powerful allies in the Middle East, not to mention an enormous source of oil. The Bush family and the House of Saud, the two most powerful dynasties in the world, have had close personal, business, and political ties for more than 20 years. In the 80s, when the elder Bush was vice president, he and Prince Bandar became personal friends. Together, they lobbied through massive U.S. arms sales to the Saudis and participated in critical foreign-policy ventures. In the 1991 Gulf War, the Saudis and the elder Bush were allies.

In the private sector, the Saudis supported Harken Energy, a struggling oil company in which George W. Bush was an investor. Most recently, former president George H. W. Bush and former secretary of state James A. Baker III, his longtime ally, have appeared before Saudis at fundraisers for the Carlyle Group, arguably the biggest private equity firm in the world. Today, former president Bush continues to serve as a senior adviser to the firm, whose investors allegedly include a Saudi accused of ties to terrorist support groups.

"It's always been very clear that there are deep ties between the Bush family and the Saudis," says Charles Lewis, head of the Center for Public Integrity, a Washington, D.C., foundation that examines issues of ethics in government. "It creates a credibility problem. When it comes to the war on terror, a lot of people have to be wondering why we are concerned about some countries and not others. Why does Saudi Arabia get a pass?"

On a humid July day, Nail al-Jubeir, director of information for Saudi Arabia, sits in his office in the Saudi Embassy in Washington and recalls the morning of September 11, 2001. Like many people, al-Jubeir was on his way to work that morning, and as soon as he heard that a second plane had crashed into the south tower of the World Trade Center, he realized that terrorists had attacked.

Over the next few days, the Saudi Embassy was in turmoil. Innocent Saudi citizens in the United States were arrested. "That created an issue," al-Jubeir says. "How do we protect the Saudis who are being rounded up? Our concern was the safety of Saudis here in the United States."

Initially, Prince Bandar had hoped that early reports of the Saudi role in the attacks had been exaggerated—after all, al-Qaeda terrorist operatives were known to use false passports. But at 10 P.M. on the evening of September 12, about 36 hours after the attacks, a high-ranking C.I.A. official—according to Newsweek, it was probably C.I.A. director George Tenet—phoned Bandar and gave him the bad news: 15 of the 19 hijackers were Saudis.

After two decades as ambassador, Bandar had long been the most recognizable figure from his country in America. Widely known as "the Arab Gatsby," with his trimmed goatee and tailored double-breasted suits, Bandar embodied the contradictions of the modern, jet-setting, Western-leaning member of the royal House of Saud. He knew that public relations had never been more crucial for the Saudis.

With the help of P.R. giant Burson-Marsteller, Bandar launched an international media blitz. He placed ads in newspapers across the country condemning the attacks and disassociating Saudi Arabia from them. On TV, he hammered home the same points: Saudi Arabia would support Amer-

ica in its fight against terrorism. The hijackers could not even be considered real Saudis, he asserted, because "we in the kingdom, the government and the people of Saudi Arabia, refuse to have any person affiliated with terrorism to be connected to our country." That included Osama bin Laden, Bandar said, since the government had taken away his passport in response to his terrorist activities.

Osama bin Laden, however, was a Saudi, and not just any Saudi. Bandar knew the members of his prominent family well. "They're really lovely human beings," he told CNN. "[Osama] is the only one. ... I met him only once. The rest of them are well-educated, successful businessmen, involved in a lot of charities. It is—it is tragic. ... He's caused them a lot of pain."

The bin Laden family neatly exemplifies the dilemma the United States faces in its relations with Saudi Arabia. On the one hand, the bin Ladens are products of Wahhabi fundamentalism, a puritanical Islamic sect that has helped make Saudi Arabia a fertile breeding ground for terrorists. Contrary to popular belief, Osama was not the only member of the immense bin Laden family—there are more than 50 siblings—with ties to militant Islamic fundamentalists. As early as 1979, Mahrous bin Laden, an older half-brother of Osama's, had befriended members of the militant Muslim Brotherhood and had played, perhaps unwittingly, a key role in the Mecca Affair, a violent uprising against the House of Saud in 1979 which resulted in more than 100 deaths.

Later, the Saudi Binladin Group became part of what was known as "the Golden Chain," a list of wealthy Saudis who nurtured al-Qaeda at its inception in the late 80s, some time before it was perceived as an international threat.

On the other hand, the bin Ladens years ago had disassociated themselves from Osama and his horrific terrorist acts. These were the Saudi billionaires who banked with Citigroup, invested with Goldman Sachs and Merrill Lynch, and did business with such icons of Western culture as Disney, Snapple, and Porsche.

The young bin Ladens and members of the House of Saud who were living in the United States in September 2001 were mostly students attending high school or college and young professionals. Several bin Ladens had attended Tufts University, near Boston. Sana bin Laden had graduated from Wheelock College, in Boston. Abdullah bin Laden, a younger brother of Osama's, was a 1994 graduate of Harvard Law School and had offices in Cambridge, Massachusetts. Two bin Ladens—Mohammed and Nawaf—owned units in the Flagship Wharf condominium complex on Boston Harbor.

Wafah (sometimes spelled Waffa) Binladin, a 26-year-old graduate of Columbia Law School, lived in a $6,000-a-month loft in New York's SoHo and was considering pursuing a singing career. Partial to hip Manhattan nightspots and restaurants such as Lotus, the Mercer Kitchen, and Pravda, she happened to be in London on September 11 and did not return to the United States. Kameron bin Laden, in his 30s and a cousin of Osama's, also frequented Manhattan nightclubs and, less than two months after 9/11, reportedly spent nearly $30,000 in a single day at Prada's Fifth Avenue boutique. He elected to stay in the United States. But half-brother Khalil Binladin decided to go back to Jidda. Khalil, who has a Brazilian wife, had been appointed Brazil's honorary consul in Jidda, though he also owns a sprawling 20-acre estate in Winter Garden, Florida, near Orlando.

As for the Saudi royal family, its members were scattered across the United States. Some had gone to Lexington, Kentucky, for the September horse auctions, which were suspended on September 11 but resumed the next day. Saudi prince Ahmed Salman, a regular in Lexington, stayed and bought two horses for $1.2 million on September 12. "I am a businessman," Salman said. "I have nothing to do with the other stuff. I feel as badly as any American."

Others felt more personally threatened. Shortly after the attacks, one of Osama bin Laden's brothers frantically called the Saudi Embassy in Washington seeking protection. He was given a room at the Watergate Hotel and told not to open the door. King Fahd, the aging and infirm Saudi monarch, sent a message to his emissaries in Washington: "Take measures to protect the innocent."

If any foreign diplomat had the clout to pull strings at the White House in the midst of a grave national-security crisis, it was Prince Bandar. The Saudis were famously adept at currying favor with U.S. administrations—they have contributed to every presidential library built in the past 30 years—but no one did it better than Bandar. He had played racquetball with Colin Powell years earlier. He had run covert operations for the late C.I.A. director Bill Casey that were kept secret even from President Ronald Reagan. He was the man who had stashed away dozens of locked attaché cases that held some of the deepest secrets in the intelligence world.

But it was his intimate friendship with

> "It's always been very clear that there are deep ties between the Bush family and the Saudis. It creates a credibility problem."

**OIL IS FORGIVEN**
Saudi Arabia's foreign minister, Prince Saud al-Faisal, and President Bush in the Oval Office nine days after the 9/11 attacks.

the Bushes that truly set him apart. When George H. W. Bush became vice president in 1981, Bandar saw him for what he was—a Texas oilman who had enormous respect for the Saudis' vast oil reserves and was not a knee-jerk defender of Israel. The two began to have lunch regularly, and in the mid-80s, at a time when the press was assailing Bush as a "wimp," Bandar staged an extravagant soirée in his honor.

After Bush became president in 1989, Bandar acted as an envoy between him and Saddam Hussein, assuring Bush that the U.S. could count on Saddam to provide a bulwark against extremist Islamic fundamentalism. In August 1990, after Iraq invaded Kuwait, Bandar joined Bush at the president's family retreat in Kennebunkport, Maine, where the two men discussed going to war together against Saddam. A few months later, at Bush's urging, Bandar persuaded King Fahd of Saudi Arabia to join Bush as an ally in the Gulf War. In 1992, Bandar took Bush's defeat by Bill Clinton as a personal loss. And after the

2000 election, Bandar flew off on his Airbus jet to go hunting in Spain with former president Bush, General Norman Schwarzkopf, and former national-security adviser Brent Scowcroft.

Now, in the wake of 9/11, the Saudi-U.S. relationship was being tested, and Bandar went into overdrive. For the 48 hours after the attacks, he stayed in constant contact with Secretary of State Colin Powell and National-Security Adviser Condoleezza Rice.

Before 9/11, coincidentally, President Bush had invited Bandar to come to the White House on September 13, 2001, to discuss the Middle East peace process. The meeting went ahead as scheduled, but in the wake of the terrorist attacks the political landscape had changed dramatically. According to *The New Yorker*, Bush told Bandar at the meeting that

> In 2000, Prince Bandar flew off to go hunting in Spain with former president Bush.



**LIKE FATHER, LIKE SON**
Then president George H. W. Bush and his good friend Prince Bandar (in the pink headdress) in Washington, D.C., August 9, 1989.

the U.S. would hand over to the Saudis any captured al-Qaeda operative who could not be made to cooperate, implying that the Saudis could use any means necessary to get suspects to talk. Nail al-Jubeir says he does not know if Prince Bandar and the president discussed getting the bin Ladens and other Saudis back to Saudi Arabia.

But the job began to get done all the same. In Tampa, on the same day that Bandar and Bush were meeting in the White House, private investigator Dan Grossi says, he and Mañuel Perez waited until three Saudi men, all apparently in their early 20s, arrived. Then the pilot took Grossi, Perez, and the Saudis to a well-appointed eight-passenger Learjet. They departed for Lexington, Kentucky, at about 4:30 P.M.

Grossi did not get the names of the students he was escorting. "It happened so fast," he says. "I just knew they were Saudis. They were well connected. One of them told me his father or his uncle was good friends with George Bush Sr."

Both the *Tampa Tribune* and sources familiar with the flight say that one of the young men was either the son or nephew of Prince Sultan bin Abdul Aziz, the Saudi minister of defense and Prince Bandar's father. Another passenger was said to have been the son of a Saudi army commander. But the Saudi Embassy declined to confirm their identities. The *Tribune* reported that the request to repatriate the Saudis had been made by a different Saudi royal, Prince Sultan bin Fahad.

According to Grossi, about an hour and 45 minutes after takeoff they landed at Blue Grass Airport in Lexington. There the Saudis were greeted by an American who took custody of them and helped them with their baggage. On the tarmac was a Boeing 747 with Arabic writing on it, apparently waiting to take them back to Saudi Arabia. "My understanding is that there were other Saudis in Kentucky buying racehorses at that time, and they were going to fly back together," Grossi says.

The Tampa-to-Lexington flight, which was reported in the *Tampa Tribune* in October 2001, is the only documented incident in which Saudis had been granted access to American airspace when U.S. citizens were still restricted from flying privately—access that required special government approval.

How did the phantom flight from Tampa get permission to take off? At the time, the F.A.A. denied the flight had taken place at all. "It's not in our logs," Chris White, a spokesman for the F.A.A., told the *Tampa Tribune*. "It didn't occur." On the record, the White House declined to comment, but privately a source there said the administration was confident that no secret flights took place and that there was no evidence to suggest that the White House had authorized such flights. According to Nail al-Jubeir, however, the repatriation had been approved "at the highest level of the U.S. government."

The process began in the bowels of the White House. At the time, the Bush administration was holed up in the Situation Room, a small underground suite with a plush, 18-by-18-foot conference room in the West Wing. Live links connected the room's occupants to the F.B.I., the State Department, and other relevant agencies. Vice President Dick Cheney, National-Security Adviser Condoleezza Rice, and other officials hunkered down and devoured intelligence, hoping to ascertain if other terrorist attacks had been planned. The most powerful officials in the administration came and went, among them Colin Powell, C.I.A. director George Tenet, and Defense Secretary Donald Rumsfeld.

Within the cramped confines of that room, the White House terrorism czar, Richard Clarke, the head of the Counterterrorism Security Group of the National Security Council, chaired an ongoing crisis group making hundreds of decisions related to the attacks. A true Washington rarity, Clarke was a civil servant who had ascended to the highest levels of policymaking. As characterized in *The Age of Sacred Terror*, by Daniel Benjamin and Steven Simon, Clarke was a man who broke all the rules. Beholden to neither Republicans nor Democrats, he refused to attend regular National Security Council staff meetings, sent insulting e-mails to his colleagues, and regularly worked outside normal bureaucratic channels. One of only two senior directors from the administration of the elder George Bush who were kept by Bill Clinton, Clarke, abrasive as he was, had continued to rise because of his genius for knowing when and how to push the levers of power.

In the days immediately after 9/11—he doesn't remember exactly when—Clarke was approached in the Situation Room about quickly repatriating the Saudis.

"Somebody brought to us for approval the decision to let an airplane filled with Saudis, including members of the bin Laden family, leave the country," Clarke says. "My role was to say that it can't happen until the F.B.I. approves it. And so the F.B.I. was asked—we had a live connection to the F.B.I.—and we asked the F.B.I. to make sure that they were satisfied that everybody getting on that plane was someone that it was O.K. to leave. And they came back and said yes, it was fine with them. So we said, 'Fine, let it happen.'" Clarke, who has since left the government and now runs a consulting firm in Virginia, adds that he does not recall who initiated the request, but that it was probably either the F.B.I. or the State Department. Both agencies deny playing any role whatsoever in the episode. "It did not come out of CONTINUED ON PAGE 175

CONTINUED FROM PAGE 166 this place," says one source at the State Department. "The likes of Prince Bandar does not need the State Department to get this done."

"I can say unequivocally that the F.B.I. had no role in facilitating these flights one way or another," says Special Agent John Iannarelli, the F.B.I.'s spokesman on counterterrorism activities.

With just three Saudis on it, the Tampa flight was hardly the only mysterious trip under way. All over the country, members of the extended bin Laden family, the House of Saud, and their associates were assembling in various locations.

According to *The New York Times*, bin Laden family members were driven or flown under F.B.I. supervision first to a secret assembly point in Texas and later to Washington. From there, the *Times* reported, they left the country when airports reopened on September 14. The F.B.I. has said the *Times* report is "erroneous."

Meanwhile, the Saudis had at least two other planes on call. Starting in Los Angeles on an undetermined date, one of them flew first to Orlando, Florida, where Khalil bin Laden boarded. From Orlando, the plane continued to Dulles International Airport, outside Washington, D.C., before going on to Boston's Logan International Airport on September 19, picking up members of the bin Laden family along the way. Other stops for the Saudis are said to have included Houston, Cleveland, and Newark. Altogether, about 140 Saudis were on the flights, according to an F.B.I. source.

By this time, the lockdown on air travel had begun to lift. The F.A.A. was allowing airlines to operate as long as they followed certain security rules. Private aviation was subject to more constraints, but even there the F.A.A. had begun to allow flights by charter-service planes when the pilots filed flight plans. The F.A.A. has given all its records of air travel during the period in question to the Department of Homeland Security. A Freedom of Information Act request has been filed, but the documents have not yet been released.

Richard Clarke's approval for repatriating the Saudis had been conditional upon the F.B.I.'s vetting them. "I asked [the F.B.I.] to make sure that no one inappropriate was leaving," he says. "I asked them if they had any objection to the entire event—to Saudis leaving the country at a time when aircraft were banned from flying." Clarke adds that he assumed the F.B.I. had vetted the bin Ladens prior to September 11. "I have no idea if they did a good job," he says. "I'm not in any position to second-guess the F.B.I."

In fact, the F.B.I. had been keeping an eye on some of the bin Ladens. A classified F.B.I. file examined by *Vanity Fair* and marked "Secret" shows that as early as 1996 the bureau had spent nearly nine months investigating Abdullah and Omar bin Laden, who were involved with the American branch of the World Assembly of Muslim Youth (WAMY), a charity that has published writings by Islamic scholar Sayyid Qutb, one of Osama bin Laden's intellectual influences. But, according to Dale Watson, the F.B.I.'s former head of counterterrorism, such investigations into Saudis in the United States were the exception. "If allegations came up, they were looked into," he says. "But a blanket investigation into Saudis here did not take place."

At times, the Saudis who had assembled for departure tried to get the planes to leave before the F.B.I. had even identified who was on them. "I recall getting into a big flap with Bandar's office about whether they would leave without us knowing who was on the plane," says one F.B.I. agent. "Bandar wanted the plane to take off, and we were stressing that that plane was not leaving until we knew exactly who was on it."

In the end, the F.B.I. decided it was simply not practical to conduct full-blown investigations. "They were identified," says Dale Watson, "but they were not subject to serious interviews or interrogations." The bureau has declined to release their identities.

Some participants in the repatriation insist that the failure to interview the Saudis was insignificant, and, indeed, a persuasive case can be made that neither the bin Ladens nor the Saudi royals would have knowingly aided terrorists. "For groups like al-Qaeda, their objective is to overthrow the Saudi government," says Nail al-Jubeir, the Saudi Embassy spokesperson. "People say we pay [al-Qaeda] off, but that's simply not the case. Why would we support people who want to overthrow our own government?"

Most of those who were leaving were either students or young businessmen. The bin Ladens, moreover, had forcefully broken with Osama by issuing a statement expressing "condemnation of this sad event, which resulted in the loss of many innocent men, women, and children, and which contradicts our Islamic faith." An F.B.I. agent says that they had a right to leave and that being related to Osama did not constitute grounds for investigation.

But 9/11 was arguably the biggest crime in American history. Nearly 3,000 people had been killed. A global manhunt of unprecedented proportions was under way. Attorney General John Ashcroft had asserted that the government had "a responsibility to use every legal means at our disposal to prevent further terrorist activity by taking people into custody who have violated the law and who may pose a threat to America." All over the country Arabs were being rounded up and interrogated. By the weekend after the attacks, Ashcroft had already proposed broadening the F.B.I.'s power to arrest foreigners, wiretap them, and trace money-laundering to terrorists. Hundreds of people were detained by the government while U.S. agents performed extensive background checks. Some were






**BLOOD TIES**
*From left:* Osama bin Laden; his niece Wafah in London, 2003; his brother Bakr, center, with King Fahd, left, circa 1992; Osama's half-brother Yeslam, 2001.

DAFYDD JONES (WAFAH)

held for as long as 10 months at the American naval base in Guantánamo, Cuba.

"It's a natural part of any investigation to seek out people who know the alleged suspect in the murder," says John L. Martin, who, as chief of internal security in the Criminal Division of the Justice Department, supervised the investigation and prosecution of national-security offenses for 18 years. "In the case of the Kennedy assassination, Lee Harvey Oswald's family, including his wife and mother, while not culpable, were looked upon for information about his background. In the case of Timothy McVeigh, McVeigh's family became a center of attention."

How could officials bypass such an elemental and routine part of an investigation during an unprecedented national-security catastrophe? At the very least, wouldn't relatives have been able to provide some information about Osama's finances, associates, or supporters?

A number of experienced investigators expressed surprise that the Saudis had not been interviewed. "Certainly it would be my expectation that they would do that," says Oliver "Buck" Revell, former associate deputy director of the F.B.I.

"Here you have an attack with substantial links to Saudi Arabia," John Martin says. "You would want to talk to people in the Saudi royal family and the Saudi government, particularly since they have pledged cooperation."

Did a simple disclaimer from the bin Laden family mean that no one in the entire family had any contacts or useful information whatsoever? Not long after 9/11, Carmen bin Laden, an estranged sister-in-law of Osama's, told ABC News that she thought members of the family might have given money to Osama. Osama's brother-in-law Mohammed Jamal Khalifa was widely reported to be an important figure in al-Qaeda and was accused of having ties to the 1993 World Trade Center bombing, to the October 2000 bombing of the U.S.S. *Cole*, and to the funding of a Philippine terrorist group. (Khalifa was rumored to be in the Philippines in September 2001.) Khalil bin Laden, who boarded a plane in Orlando that eventually took him back to Saudi Arabia, won the attention of Brazilian investigators for possible terrorist connections. According to a Brazilian paper, he had business connections in the Brazilian province of Minas Gerais, not far from the tri-border region, an alleged center for training terrorists.

Then there were the secret F.B.I. documents detailing Abdullah and Omar bin Laden's involvement with the World Assembly of Muslim Youth. Indian officials and the Philippine military have both cited WAMY for funding terrorism in Kashmir and the Philippines. "WAMY was involved in terrorist-support activity," says a security official who served under George W. Bush. "There's no doubt about it."

F.B.I. officials declined to comment on the investigation, which was reported in Britain's *The Guardian,* but the documents show that the file on Abdullah and Omar was reopened on September 19, 2001, while the Saudi repatriation was still under way. "These documents show there was an open F.B.I. investigation into these guys at the time of their departure," says David Armstrong, an investigator for the Public Education Center, the Washington, D.C., foundation that obtained the documents.

In the 1980s, with the support of the American government, the House of Saud and prominent Saudi businessmen had eagerly contributed to the fight against the Soviets in Afghanistan by sending money and weapons to Islamic-fundamentalist rebels who were battling alongside local mujahideen forces. Both the Saudis and the Americans supported these militants. But after helping to expel the Soviets from Afghanistan, these guerrillas, led by Osama bin Laden, morphed into the terrorist network known as al-Qaeda. Vexing questions remain about the extent to which the Saudis continued to support militant Islamic fundamentalism after bin Laden and al-Qaeda began attacking U.S. targets in the 1990s.

During the Clinton administration, the Saudis repeatedly resisted attempts by the United States to track the funding of terrorism within the kingdom. According to Richard Clarke, who led that initiative, there were several reasons for resistance from the Saudis. "Some of them were clearly sympathetic to al-Qaeda," he says. "Some of them thought that if they allowed a certain degree of cooperation with al-Qaeda, al-Qaeda would leave them alone. And some of them were merely reacting in a knee-jerk, instinctive way to what they believed was interference in their internal affairs."

Again and again, the U.S. Treasury Department has gone after the directors of various Islamic charities for providing support to terrorists. In October 2002 the Council on Foreign Relations asserted that, more than a year after 9/11, al-Qaeda continued to raise funds from wealthy Saudi supporters.

Last November, *Newsweek* reported that thousands of dollars in charitable gifts from Princess Haifa, the wife of Prince Bandar, had indirectly ended up in the hands of two of the September 11 hijackers. And many members of the royal family, along with several members of the bin Laden family, are now defendants in the $1 trillion class-action lawsuit filed on behalf of 4,000 relatives of 9/11 victims.

Documents filed in the suit allege that Prince Bandar's father, Defense Minister Prince Sultan, has contributed at least $6 million since 1994 to four charities that finance Osama bin Laden and al-Qaeda. Sultan's own attorneys acknowledge that for 16 consecutive years he approved annual payments of about $266,000 to the International Islamic Relief Organization—a Saudi charity whose U.S. offices were raided by federal agents. Casey Cooper, an attorney for Prince Sultan, says, "The allegations have no merit." He adds that Prince Sultan authorized the grants as part of his official governmental duties and did not knowingly fund terrorism.

The allegation against Prince Sultan is just one of hundreds included in the lawsuit. In addition to Osama bin Laden, the family company, the Saudi Binladin Group,





**GULF PARTNERS**
Crown Prince Abdullah, center, and Vice President Dick Cheney in Jidda, March 16, 2002.

> "Somebody brought to us . . . the decision to let an airplane filled with Saudis, including members of the bin Laden family, leave the country."

J. SCOTT APPLEWHITE

has been named as a defendant in the suit. At the heart of the allegations is the charge that the defendants knew some of their money was going to al-Qaeda and therefore had some responsibility for the September 11 attacks.

Many of the Saudis acknowledge that they contributed to the charities in question but say they had no knowledge that the money would end up in the hands of al-Qaeda. "The biggest problem we have with Saudi charities is poor and sloppy management," says Nail al-Jubeir.

The plaintiffs' attorneys do not consider that a satisfactory answer. In addition, they believe that, by interviewing the bin Ladens and members of the royal family before they left the country, the government could have answered some key questions. "They should have been asked whether they had contacts or knew of any other Saudi contacts with Osama bin Laden," says Allan Gerson, co-lead counsel for the plaintiffs in the case. "What did they know about the financing of al-Qaeda? What did they know about the use of charitable institutions in the U.S. and elsewhere as conduits for terrorism financing? Why was the Saudi government not responsive to U.S. pleas in 1999 and 2000 that they stop turning a blind eye to terrorist financing through Saudi banks and charities?"

All of which leads to the question of who made the decision to let the Saudis go. And why? Could the long-standing relationship between the Saudis and the Bush family have influenced the administration?

National-security experts such as Richard Clarke find that suggestion dubious. "Prince Bandar played a very key role during the first Gulf War," Clarke says. "He was very close to the Bush family. But I don't think it's accurate to say that he plays that role now. There's a realization that we have to work with the government we've got in Saudi Arabia. The alternatives could be far worse. The most likely replacement to the House of Saud is likely to be more hostile—in fact, extremely hostile—to the U.S. That's probably the reason the administration treats it the way it does—not any personal relationship." With the war on terror getting under way, the U.S. wanted Saudi cooperation, and repatriation was clearly a high priority at the highest levels of the kingdom.

Still, the Bush-Saudi relationship raises serious questions, if only because it is so extraordinary for two presidents to share such a long and rich personal history with any foreign power, much less one that is both as vital to U.S. economic interests and as troublesome as Saudi Arabia.

It began in the mid-70s, when two young Saudi billionaires—Salem bin Laden, Osama's older brother and the head of the Saudi Binladin Group, and Khalid bin Mahfouz, a billionaire Saudi banker—first came to Texas hoping to forge political relationships. To represent their American interests, they chose a Houston businessman named James R. Bath, who knew George W. Bush from the Texas Air National Guard. Bath invested $50,000 in Bush's new oil company,

> "We were in the midst of the worst terrorist act in history, and here we were seeing an evacuation of the bin Ladens!"

Arbusto. He denies, however, that his investment represented the Saudis' interests.

In 1986, George W. Bush sold the latest incarnation of his failing oil company to Harken Energy, an independent Texas oil company that was struggling itself, and took a seat on its board of directors. By then, Khalid bin Mahfouz had become the largest stockholder in the Bank of Commerce & Credit International, or B.C.C.I., an international bank which financed drug dealers, terrorists, and covert operations and which became known as the most corrupt financial institution in history.

Once Bush was with Harken, a phantom courtship by Khalid bin Mahfouz and B.C.C.I. began. Neither George W. Bush nor Harken ever had any direct contact with bin Mahfouz or B.C.C.I. Yet once Bush took his seat on the board, wonderful things started to happen to Harken—new investments, unexpected sources of financing, serendipitous drilling rights. Among those with links to B.C.C.I. who came to Harken's aid were the Arkansas investment bank Stephens Inc., Saudi investor Sheik Abdullah Bakhsh, and the Emir of Bahrain, who unexpectedly awarded Harken exclusive offshore drilling rights. In 1991, a Wall Street Journal investigation into Harken's B.C.C.I. ties concluded, "The number of B.C.C.I.-connected people who had dealings with Harken—all since George W. Bush came on board—likewise raises the question of whether they mask an effort to cozy up to a presidential son."

After George H. W. Bush and James Baker returned to the private sector in 1993, they finally began to reap the benefits of their friendship with the Saudis. That year, Baker took a position as senior counselor with the Carlyle Group, the $16 billion private-equity firm. Two years later, Bush signed on as senior adviser. In 1998, former British prime minister John Major joined the firm as well.

On several occasions, Bush, Baker, and Major flew to Saudi Arabia with Carlyle executives to meet with and speak before members of the royal family and wealthy businessmen such as the bin Ladens and the bin Mahfouzes, Saudi Arabia's richest banking family.

As world leaders who had defended the Saudis during the Gulf War, Bush, Baker, and Major had the potential to be star rainmakers for Carlyle, and the firm's practices allowed them to do so without sullying their hands by asking for money directly. "Bush's speeches are about what it's like to be a former president, and what it's like to be the father of a president," says Carlyle C.E.O. David Rubenstein. "He doesn't talk about Carlyle or solicit investors." After Bush's speeches, Rubenstein and his fund-raising team would come in for the money. "Carlyle wanted to open up doors," one observer told The Independent, "and they bring in Bush and Major, who saved the Saudis' ass in the Gulf War. If you got these guys coming in ... those companies are going to have it pretty good." Rubenstein says Bush and Baker were not given special treatment in Saudi Arabia. "They were well received there, as they are throughout the world."

A source close to the Saudi government says that the royal family viewed investing in the Carlyle Group as a way to show gratitude to President Bush for defending the Saudis in the Gulf War. "George Bush or James Baker would meet with all the big guys in the royal family," the source says. "Indirectly, the message was 'I'd appreciate it if you put some money in the Carlyle Group.'"

According to The Washington Post, Prince Bandar was among those who invested. In 1995 the bin Ladens joined in. Khalid bin Mahfouz's sons Abdulrahman and Sultan became investors as well, according to family attorney Cherif Sedky. Abdulrahman bin Mahfouz was a director of the Muwafaq Foundation, which has been designated by the U.S. Treasury Department as "an al-

Qaeda front." "Abdulrahman and Sultan made an investment in one of the Carlyle funds in 1995 which is in the neighborhood of $30 million," Sedky wrote in an e-mail. "The investment is held for their benefit by Sami Ba'arma," an investment manager who has often worked with the bin Mahfouz family. Sedky added that the bin Mahfouz family condemns terrorism and denies that funds it has given to charities have been used to finance terror. Carlyle categorically denies that the bin Mahfouzes are now or have ever been investors. Reached on vacation in Michigan, Cherif Sedky stood by his original statement. "I assume that Carlyle has records of investments from somebody on the bin Mahfouz side, whether it is with Sami Ba'arma as a nominee or someone else," he said. He added that Ba'arma was a first cousin of the bin Mahfouz brothers.

In all, Carlyle officials say that the Saudis have invested $80 million in the firm. It is unclear how much of that was raised following meetings attended by former president George Bush or James Baker. The bin Ladens put $2 million in the Carlyle Partners II Fund, a relatively small sum that was said to be part of a larger package. One family member, Shafig bin Laden, was attending an investor conference held by the Carlyle Group in Washington on September 11, 2001. But after the attacks of that day, Carlyle bought out the bin Ladens' interest. "At first I felt it was unfair to blame the other 53 half-siblings because of this guy they haven't seen in 10 years," Rubenstein says. "But then I realized, life isn't fair at times."

There is no evidence to suggest that Carlyle played any role in the repatriation of the Saudis, but public advocates argue that the Bush-Saudi ties create at least the appearance of a conflict of interest. "You would be less inclined to do anything forceful or dynamic if you are tied in with them financially," says the Center for Public Integrity's Charles Lewis. "That's common sense."

On September 18, 2001, a specially re-configured Boeing 727 flew at least five members of the bin Laden family back to Saudi Arabia from Logan airport.

On September 19, President Bush's speechwriting team was working on a stirring address to be delivered the next day, officially declaring a global war on terror. "Our war on terror ... will not end until every terrorist group of global reach has been found, stopped, and defeated," he would vow. At the Pentagon, planning was already under way to take this new war on terror all the way to Iraq.

That same day, the plane that had originated in Los Angeles and made stops at Orlando and Dulles airports arrived at Logan. It is unclear how many members of the bin Laden family or other Saudis had boarded prior to its arrival in Boston, but once it landed, at least 11 additional bin Laden relatives boarded the aircraft.

At the time, Logan was in chaos. The airport was reeling from criticism that its security failures had allowed the hijackings to take place. After all, the two hijacked planes that had crashed into the World Trade Center had departed from Logan. As a result, exceptional measures were now being taken. Several thousand cars were towed from the airport's parking garages. "We didn't know if they were booby-trapped or what," says Tom Kinton, director of aviation at Logan.

The F.A.A. had allowed commercial flights to resume on September 13, as long as they complied with new security measures. Logan, however, because of various security issues, did not re-open until September 15, two days later. Even then, air traffic resumed slowly. So when a call came into Logan's Emergency Operations Center in the early afternoon of September 19 saying that the charter aircraft was going to pick up members of the bin Laden family, Kinton was incredulous. "We were in the midst of the worst terrorist act in history," he says, "and here we were seeing an evacuation of the bin Ladens!"

Like Kinton, Virginia Buckingham, then the head of the Massachusetts Port Authority, which oversees Logan, was stunned. "My staff was told that a private jet was arriving at Logan from Saudi Arabia to pick up 14 members of Osama bin Laden's family living in the Boston area," she later wrote in *The Boston Globe*. "'Does the F.B.I. know?' staffers wondered. 'Does the State Department know? Why are they letting these people go? Have they questioned them?' This was ridiculous."

Only a few days earlier, some planes, such as the one carrying a heart to be transplanted to a deathly ill cardiac patient in Olympia, Washington, had been forced down in midflight. According to F.B.I. spokesman John Iannarelli, F.B.I. counterterrorism agents pursuing the investigation were stranded all over the country, unable to fly for several days. Yet now the same counterterrorism unit was effectively acting as a chaperone for the Saudis. Astonishingly, the repatriation was routed through Logan and Newark, two of the airports where, just a few days earlier, the hijackings had originated.

> Bush, Baker, and Major flew to Saudi Arabia with Carlyle executives to meet with members of the royal family.

**DESERT STORMERS**
George H. W. Bush and former British prime minister John Major visit King Fahd in Saudi Arabia, 2000.

As the bin Ladens began to approach Boston, the top brass at Logan airport were agog at what was taking place. But federal law did not allow them much leeway to restrict individual flights. "I wanted to go to the highest authorities in Washington," says Tom Kinton. "This was a call for them. But this was not just some mystery flight dropping into Logan. It had been to three major airports already, and we were the last stop. It was known. The federal authorities knew what it was doing. And we were told to let it come."

Kinton and his co-workers were also told to let the other bin Ladens board and to allow the plane to leave and return to Saudi Arabia. As Virginia Buckingham put it, "Under the cover of darkness, they did."

It was an inauspicious start to the just-declared war on terror. "What happened on September 11 was a horrific crime," says John Martin, the former Justice Department official. "It was an act of war. And the answer is no, this is not any way to go about investigating it." □

*Tampa Tribune (Florida) October 5, 2001, Friday, FINAL EDITION*

Copyright 2001 The Tribune Co. Publishes The Tampa Tribune
Tampa Tribune (Florida)

**October** 5, 2001, Friday, FINAL EDITION

**SECTION:** NATION/WORLD, Pg. 1

**LENGTH:** 879 words

**HEADLINE:** Phantom **Flight** From Florida

**BYLINE:** KATHY STEELE , ksteele@tampatrib.com; Reporter Kathy Steele can be reached at (813) 885-5437. Reporters Brenna Kelly and Elizabeth Lee Brown contributed to this report. They can be reached at (813) 885-5437.

**BODY:**
FEDS DENY JET CARRIED 3 SAUDIS TO KENTUCKY ON SEPT. 13

TAMPA - The twin-engine Lear jet streaked into the afternoon sky, leaving Tampa behind but revealing a glimpse of international intrigue in the aftermath of terrorist attacks on America.

The federal government says the **flight** never took place.

But the two armed bodyguards hired to chaperon their clients out of the state recall the 100-minute trip Sept. 13 quite vividly.
In the end, the son of a **Saudi** Arabian prince who is the nation's defense minister, and the son of a **Saudi** army commander made it to Kentucky for a waiting 747 and a trip to their homeland.

The hastily arranged **flight** out of Raytheon Airport Services, a private hangar on the outskirts of Tampa International Airport, was anything but ordinary. It lifted off the tarmac at a time when every private plane in the nation was grounded due to safety concerns after the Sept. 11 attacks.

Local and federal authorities will say little about the **flight.**

"It's not in our logs. ... It didn't occur," said Chris White, a spokesman for the Federal Aviation Administration's regional office in Atlanta.

For private investigators Dan Grossi and Manuel Perez, the bodyguards on the Lear, it was a trip they can't forget.


A Special Situation

Grossi said Tampa police intelligence detectives called him about 11 a.m. Sept. 13, needing help with a special situation: They had been watching three young **Saudi** men - at least one a student at the University of Tampa - at their south Tampa apartment, and the trio was scared and wanted to go home.

Jim Harf, the director of UT's international programs, confirmed one of them is the son of Prince Sultan, the defense minister.

University spokesman Grant Donaldson refused to provide details. Perez said he understood the men arrived in Tampa three weeks earlier to receive tutoring in English.

The Tampa detectives guarding the men were ordered to stay in Tampa by Police Chief Bennie Holder, so Grossi was offered the job of escorting the trio to Lexington, Ky., where the prince's relatives were buying race horses.

Lexington police Lt. Mark Barnard confirmed a **Saudi** relative had asked for help in getting protection for the men in Tampa. Two off-duty detectives were assigned. Tampa police records list Sultan bin Fahad as the one requesting the security detail.

But Tampa's official assistance ended at Raytheon's airport terminal.

"There was a perceived threat, and the **family** of the person wanted him home right away," said Tampa police Sgt. John Solomon. "The job lasted about five hours. It was handled very quickly."


"Out Of A Tom Clancy Movie'

Meanwhile, Grossi had put Perez on alert and went home to wait. Both men provide security for the National Football League at Raymond James Stadium. Grossi, who retired from the Tampa Police Department in August, has worked in internal affairs and homicide. Perez, who has his own investigative company in St. Petersburg, worked for the FBI for more than 29 years and has experience in counterterrorism and as a bomb technician.

At 2:30 p.m., Grossi got the call from the police department.

"They said it was happening," Grossi said. "This was out of a Tom Clancy movie."

Grossi said he was told the clearance came from the White House after the prince's **family** pulled a favor from former President Bush. Prince Sultan, the **Saudi** defense minister, was part of the coalition that fought the Persian Gulf War in 1991.

To the United States, **Saudi** Arabia is a key component in the emerging coalition of nations in the war on terrorism.

The White House referred questions on the trip to the State Department, which denied involvement, and the National Security Council, which did not return messages.

At Raytheon airport, Grossi met with the Tampa detectives who had brought the young men. The Lear's pilot, who had flown in from Fort Lauderdale, introduced himself.

By 4:30 p.m., the twin-engine, eight-passenger jet lifted off.

"They [the trio] looked like typical college students with knapsacks," Perez said. "I

didn't realize the prince's son was onboard until we landed."

Grossi and Perez recalled the strange feeling of flying in the near-empty sky, knowing of the ban on private **flights.**

"My first reaction to the pilot was, "We're not going to get shot down, are we?' " Perez said.

Grossi said he spoke only briefly to the prince's son.

"He wanted to leave," Grossi said. But he also said he would like to return, Grossi said.

In less than two hours, the Lear landed at the Blue Grass airport, where the passengers were met by **Saudi** security officials, Grossi said. He and Perez saw several private 747s parked on the tarmac with foreign flags on the tails and Arabic lettering on the sides.

Within the hour, the Lear took off again for Tampa with Grossi and Perez. Neither would say how much they were paid.

But the Lear was not headed back to Fort Lauderdale, Grossi said the pilot told him. It was bound for New Orleans to pick up someone who needed a ride to New York.

Grossi said he doesn't recall the name of the aircraft company providing the jet.

"Who knows who they really were?" Grossi said. "It was certainly somebody important to obtain clearance to fly."

**GRAPHIC:** PHOTO 2 (1C)
Tribune photo by CLIFF McBRIDE

(C) Dan Grossi was hired to escort three **Saudi** men out of the state Sept. 13, when the government had grounded private **flights.**
Sultan bin Fahad

The **Saudi** defense minister's son was in Tampa.